**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION**


**ROBERT W. HALL**                                                          **PLAINTIFF**


**v.**                            **Case No. 1:09-CV-00057-JLH**


**EQUITY NATIONAL LIFE INSURANCE
COMPANY, et al.**                                              **DEFENDANTS**


---

**TRANSAMERICA LIFE INSURANCE COMPANY'S
MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT**

---

Markham R. Leventhal                    John K. Baker (ABA #97024)
Farrokh Jhabvala                        MITCHELL, WILLIAMS, SELIG,
Julianna Thomas McCabe                     GATES & WOODYARD, P.L.L.C.
JORDEN BURT LLP                         425 West Capitol Avenue, Suite 1800
777 Brickell Avenue, Suite 500          Little Rock, Arkansas  72201
Miami, Florida  33131                   Telephone:  (501) 688-8800
Telephone:  (305) 371-2600              Facsimile:  (501) 918-7850
Facsimile:  (305) 372-9928


*Attorneys for Defendants Transamerica
Life Insurance Company and AEGON USA, LLC*

## TABLE OF CONTENTS

*Page*

TABLE OF CONTENTS....................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. iii

INTRODUCTION ...............................................................................................................1

STATEMENT OF UNDISPUTED MATERIAL FACTS ...................................................5

    The Policy .......................................................................................................................5

    "Chargemasters" and "List Prices"................................................................................8

    Payment of "Actual Charges" Benefits and Plaintiff's Claims .....................................9

    Plaintiff's Surgery and Anesthesia Claims ..................................................................11

LEGAL STANDARD.........................................................................................................16

ARGUMENT .....................................................................................................................16

I.     ALABAMA LAW GOVERNS PLAINTIFF'S CONTRACT CLAIMS IN THIS ACTION..........................................................................................................16

II.    TRANSAMERICA IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CONTRACT CLAIMS RELATING TO PLAINTIFF'S SURGERY AND ANESTHESIA BECAUSE TRANSAMERICA HAS FULLY PAID THE BENEFITS FOR THOSE CLAIMS .................................................18

III.   PLAINTIFF'S POLICY CANNOT BE REASONABLY CONSTRUED TO REQUIRE TRANSAMERICA TO PAY BENEFITS BASED ON "LIST" PRICES THAT ARE NOT BEING BILLED, CHARGED, OR PAID ...........................................................................................................................20

    A.    Under Alabama Law, The Policy Must Be Interpreted According To Its Plain and Ordinary Meaning .......................................................20

    B.    Under Alabama Law, The Policy Must Be Construed As a Whole And With The Fundamental Purpose Of The Policy To Insure Against "Loss" And To Measure Benefits By "Incurred Expenses"....................24

IV.   TRANSAMERICA IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S BAD FAITH CLAIMS............................................................................28

## TABLE OF CONTENTS
(continued)

*Page*

V.   TRANSAMERICA IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S UNJUST ENRICHMENT CLAIM BECAUSE PLAINTIFF IS SUING ON A WRITTEN CONTRACT AND HAS AN ADEQUATE REMEDY AT LAW ...................................................................................31

VI.  TRANSAMERICA IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM FOR DECLARATORY AND INJUNCTIVE RELIEF.................................................................................................................................32

CONCLUSION......................................................................................................................36

CERTIFICATE OF SERVICE .............................................................................................37

# TABLE OF AUTHORITIES

*Page*

**Cases**

*Adarand Constructors, Inc. v. Pena,*
  515 U.S. 200 (1995)..............................................................................................33

*Alabama Farm Bureau Mutual Casualty Insurance Co. v. Preston,*
  253 So. 2d 4 (Ala. 1971).................................................................................21, 24

*American National Property & Casualty Co. v. Blocker,*
  165 F. Supp. 2d 1288 (S.D. Ala. 2001)...............................................................21

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986)..............................................................................................16

*Arkansas Blue Cross & Blue Shield, Inc. v. Foerster,*
  832 S.W.2d 280 (Ark. Ct. App. 1992).................................................................23

*Arnett v. Arnett,*
  812 So. 2d 1246 (Ala. Civ. App. 2001) ...............................................................27

*Ashcroft v. Mattis,*
  431 U.S. 171 (1977)..............................................................................................34

*Butler v. Dowd,*
  979 F.2d 661 (8th Cir. 1992) ...............................................................................34

*Ceballo v. Citizens Property Insurance Corp.,*
  967 So. 2d 811 (Fla. 2007)...................................................................................23

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986)..............................................................................................16

*Celtic Life Insurance Co. v. McLendon,*
  814 So. 2d 222 (Ala. 2001)...........................................................................24, 28

*City of Los Angeles v. Lyons,*
  461 U.S. 95 (1983)..........................................................................................33, 34

*Claybrook v. Central United Life Insurance Co.,*
  387 F. Supp. 2d 1199 (M.D. Ala. 2005) ..................................3, 20, 21-22, 36

*DaimlerChrysler Corp. v. Cuno,*
  547 U.S. 332 (2006)..............................................................................................33

## TABLE OF AUTHORITIES

(continued)

*Page*

*Drearr v. Connecticut General Life Insurance Co.*,
　199 So. 2d 149 (La. Ct. App. 1960).................................................................. 27

*Federal Insurance Co. v. Hartford Steam Boiler Inspection & Insurance Co.*,
　415 F.3d 487 (6th Cir. 2005) ........................................................................... 28

*Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*
　528 U.S. 167 (2000).......................................................................................... 33

*Golden v. Zwickler*,
　394 U.S. 103 (1969).................................................................................... 34, 35

*Gooch v. Life Investors Insurance Co. of America*,
　264 F.R.D. 340 (M.D. Tenn. 2009) ................................................................. 23

*Guidry v. American Public Life Insurance Co.*,
　512 F.3d 177 (5th Cir. 2007) ........................................................................... 23

*Harmon v. City of Kansas City, Missouri*,
　197 F.3d 321 (8th Cir. 1999) ...................................................................... 33, 34

*Haynes v. United States*,
　353 U.S. 81 (1957)............................................................................................ 28

*Hillery v. Allstate Indemnity Co.*,
　705 F. Supp. 2d 1343 (S.D. Ala. 2010)............................................................ 29

*Hilley v. Allstate Insurance Co.*,
　562 So. 2d 184 (Ala. 1990).............................................................................. 29

*Irby v. Government Employees Insurance Co.*,
　175 So. 2d 9 (La. Ct. App. 1965)..................................................................... 27

*Lake Martin/Alabama Power Licensee Ass'n v. Alabama Power Co.*,
　601 So. 2d 942 (Ala. 1992)............................................................................... 29

*Lexicon, Inc. v. Ace America Insurance Co.*,
　2010 WL 79479 (E.D. Ark. Jan 7. 2010)........................................................ 16

*Lienemann v. King*,
　26 F.3d 126, 1994 WL 263814 (8th Cir. May 23, 1994)............................ 17-18

*Liggans R.V. Center v. John Deere Insurance Co.*,
　575 So. 2d 567 (Ala. 1991).............................................................................. 21

**TABLE OF AUTHORITIES**
(continued)

*Page*

*Lindley v. Life Investors Insurance Co. of America,*
 2010 WL 723670 (N.D. Okla. Feb. 22, 2010) ................................................. 23

*Martin v. Sargent,*
 780 F.2d 1334 (8th Cir. 1985) ....................................................................... 35

*National Savings Life Insurance Co. v. Dutton,*
 419 So. 2d 1357 (Ala. 1982) ..................................................................... 29, 30

*National Security Fire & Casualty Co. v. Bowen,*
 417 So. 2d 179 (Ala. 1982) ................................................................... 28-29, 31

*Northern Assurance Company of America v. Bayside Marine Construction., Inc.,*
 2009 WL 151023 (S.D. Ala. Jan. 21, 2009) .............................................. 31, 32

*O'Shea v. Littleton,*
 414 U.S. 488 (1974) ............................................................................... 33-34

*Pace v. Colonial Penn Insurance Co.,*
 690 So. 2d 369 (Ala. Civ. App. 1996) ....................................................... 30-31

*Peachtree Casualty Insurance Co. v. Sharpton,*
 2001 WL 286919 (M.D. Ala. Mar. 20, 2001) ......................................... 29-30, 31

*Philadelphia American Life Insurance Co. v. Buckles,*
 350 F. App'x 376 (11th Cir. 2009) ................................... 2-3, 22-23, 24, 36

*Pipes v. Life Investors Insurance Co. of America,*
 254 F.R.D. 544 (E.D. Ark. 2008) ................................................................... 8

*Pritchett v. State Farm Mutual Automobile Insurance Co.,*
 834 So. 2d 785 (Ala. Civ. App. 2002) ..................................................... 21, 24

*Protective Industrial Insurance Co. of Alabama v. Gray,*
 118 So. 2d 289 (Ala. Civ. App. 1960) ....................................................... 25-26

*Reliance Mutual Life Insurance Co. of Illinois v. Booher,*
 166 So. 2d 222 (Fla. 2d DCA 1964) ............................................................. 23

*Safeway Insurance Company of Alabama v. Herrera,*
 912 So. 2d 1140 (Ala. 2005) ..................................................................... 20-21

*Scott v. Allstate Insurance Co.,*
 2005 WL 1883687 (E.D. Ark. Aug. 8, 2005) ................................................. 17

# TABLE OF AUTHORITIES
(continued)

*Page*

*Shelter Insurance Cos. v. Hildreth,*
    255 F.3d 921 (8th Cir. 2001) ........................................................................ 16

*Smook v. Minnehaha County,*
    457 F.3d 806 (8th Cir. 2005) ..................................................................... 33-34

*State Farm Fire & Casualty Co. v. Billingsley,*
    2010 WL 1511560 (S.D. Ala. Apr. 14, 2010)................................................ 30

*State Farm Mutual Automobile Insurance Co. v. Bowers,*
    500 S.E.2d 212 (Va. 1998).............................................................................. 27

*Sullivan v. State Farm Mutual Automobile Insurance Co.,*
    513 So. 2d 992 (Ala. 1987)............................................................................. 21

*Summit Properties International, LLC v. LPGA,*
    2010 WL 2382405 (S.D.N.Y June 14, 2010) ................................................ 35

*Temple University Hospital, Inc. v. Healthcare Management Alternatives, Inc.,*
    832 A.2d 501 (Pa. Super. Ct. 2003)................................................................ 2

*Turner v. U.S. Fidelity & Guaranty Co.,*
    440 So. 2d 1026 (Ala. 1983)........................................................................... 24

*U.S. Fire Insurance Co. v. Kresser Motor Service, Inc.,*
    26 F.3d 91 (8th Cir. 1994) .......................................................................... 16-17

*U.S. v. St. Paul Mercury Indemnity Co.,*
    238 F.2d 594 (8th Cir. 1956) ...................................................................... 26-27

*Vencor Inc. v. National States Insurance Co.,*
    303 F.3d 1024 (9th Cir. 2002) ........................................................................ 2

*Ward v. Dixie National Life Insurance Co.,*
    2007 WL 4293319 (4th Cir. Nov. 29, 2007)................................................... 23

*Weaver v. Allstate Ins. Co.,*
    574 So. 2d 771 (Ala. 1990)............................................................................. 29

*Webb v. International Indemnity Co.,*
    599 So. 2d. 1144 (Ala. 1992).......................................................................... 30

*Whirlpool Corp. v. Ritter,*
    929 F.2d 1318 (8th Cir. 1991) ........................................................................ 17

# TABLE OF AUTHORITIES
## (continued)

*Page*

*White v. Microsoft Corp.*,
    454 F. Supp. 2d 1118 (S.D. Ala. 2006)............................................................. 31

*Wilton v. Seven Falls Co.*,
    515 U.S. 277 (1995)............................................................................................ 35

*Yoder v. Safeco Insurance Co. of America*,
    2006 WL 568329 (E.D. Ark. Mar. 7, 2006) ..................................................... 16

**Statutes**

28 U.S.C. § 2201......................................................................................................... 34

GA. CODE ANN. § 33-24-16.1(a) (2006)..................................................................... 10

MO. REV. STAT. § 376.789(1)(2) (2009)..................................................................... 10

OKLA. STAT. ANN. tit. 36, § 3651(A) (2006) .............................................................. 10

S.C. CODE ANN. § 38-71-242(A)(1) (2008)........................................................... 10, 23

TEX. INS. CODE ANN. § 1201.0601 (2005) .................................................................. 10

**Rules**

Federal Rule of Civil Procedure 1 .............................................................................. 16

Federal Rule of Civil Procedure 56 ........................................................................ 1, 16

U.S. District Court, W.D. Arkansas, Local Rule 56.1 .............................................. 1, 5

**Other Authorities**

10A *Couch on Insurance* § 144:1 (3d ed. updated 2007) ............................................ 28

26 C.J.S. *Declaratory Judgments* § 13 (Updated 2010) .............................................. 35

*Black's Law Dictionary* (6th ed. 1990)....................................................................... 28

*Black's Law Dictionary* (7th ed. 1999)....................................................................... 28

*Black's Law Dictionary* (8th ed. 2004)....................................................................... 23

Christopher P. Thompkins, Stuart H. Altman, and Efrat Eilat, *The Precarious Pricing
    System for Hospital Services,* 25 Health Affairs 45 (2006)................................. 8

## TABLE OF AUTHORITIES

(continued)

*Page*

Council on Ethical and Judicial Affairs, Code of Medical Ethics of the American Medial
    Association, Current Opinions with Annotations, ¶ 6.05 (2006-2007 Ed.)...................... 19

George A. Nation III, *Obscene Contracts:  The Doctrine of Unconscionability and
    Hospital Billing of the Uninsured*, 94 Ky. L.J. 101 (2005) ................................................ 2

John Carreyrou, *As Medical Costs Soar, The Insured Face Huge Tab*, WALL ST. J.,
    Nov. 29, 2007................................................................................................................... 2

*Miriam Webster's Collegiate Dictionary* 611 (10th ed. 1997)..................................................... 27

*The American Heritage Dictionary of the English Language*, Fourth Edition, Copyright
    2000 by Houghton Mifflin Company ............................................................................ 22

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Defendant Transamerica Life Insurance Company ("Transamerica") submits this memorandum of law in support of its Motion for Summary Judgment (the "Motion"). For the reasons set forth below, Transamerica is entitled to summary judgment on plaintiff's claim for breach of contract (Count I) with respect to the surgery and anesthesia claims alleged in paragraph 42 of the Complaint (the "Surgery and Anesthesia Claims").[1] Transamerica is also entitled to summary judgment with respect to plaintiff's claims for bad faith (Counts II and V), unjust enrichment (Count III), and for injunctive and declaratory relief (Count IV).

## INTRODUCTION

This action involves a contract dispute relating to a supplemental cancer insurance policy (the "Policy") purchased by Robert W. Hall ("plaintiff" or "Hall") in 1994 from Equity National Life Insurance Company ("Equity National"),[2] a predecessor of Life Investors Insurance Company of America ("Life Investors") and Transamerica.[3] The Policy insures for "loss incurred" and provides a Schedule of specified benefits, most of which are limited to fixed dollar amounts. Some of the Policy's benefits are based on the "actual charges" or "actual fee" for the

---

[1] By Order dated July 9, 2010, this Court dismissed plaintiff's class action allegations. Docket no. 40. This Motion addresses plaintiff's individual claims based on the facts specifically pled in the Complaint. Plaintiff has recently suggested in discovery that he may have additional claims that have not been pled, but plaintiff made no attempt to amend his Complaint to add any additional claims.

[2] A copy of plaintiff's Policy is attached as Exhibit B to the Declaration of Connie Whitlock in Support of Transamerica's Motion for Summary Judgment ("Whitlock Decl."). A copy of the Whitlock declaration is attached as Exhibit 1 to Transamerica's Motion.

[3] In June 1995, Equity National merged into Life Investors. *See* Declaration of Connie Whitlock in Support of AEGON USA, LLC's Motion for Summary Judgment ¶ 6, filed Nov. 24, 2010 (Docket no. 60-2). Effective October 2, 2008, Life Investors merged into Transamerica. *Id*. ¶ 2. All references to Transamerica in this memorandum include Life Investors unless otherwise indicated.

services rendered, up to a designated maximum stated in the Policy.  As a condition precedent to receiving benefits under the Policy, including benefits based on "actual charges," the insured is required to submit a written "proof of loss" for "each incurred expense."  Policy, Section K, ¶ 9, at p. 15 ("Indemnities payable under this policy for any loss will be paid as soon as we receive proper written proof of loss."); Section C, at p. 6 ("Proof of loss must be submitted to us for each incurred expense.").  The Policy provides that benefits are paid in cash directly to the insured. The Policy does not coordinate benefits, but pays the full amount specified under the Policy, even when the insured's medical expenses are fully paid by other health insurance.

The parties' dispute relates to the amount of benefits paid for "actual charges" pursuant to the Policy Schedule and the "proof of loss" for "each incurred expense" necessary to receive benefits under the Policy.  This case is similar to *Philadelphia American Life Insurance Co. v. Buckles*, 350 F. App'x 376 (11th Cir. 2009), where the policyholder incurred hospital expenses of $1,600,000, but argued that his "actual charges" were the hospital's "list prices" of $4,900,000.  *Id.* at 380.[4]  The policyholder sought payment of the hospital's "list prices" under a supplemental cancer policy.  The Eleventh Circuit rejected the policyholder's position, holding that "actual charges incurred" as used in the policy meant the "actual amount accepted by a health care provider as full satisfaction of the insured's obligations for treatment."  *Id.*  The court

---

[4] "List prices" are artificially inflated maximum prices that are rarely charged to consumers or insurers paying on their behalf.  *See* George A. Nation III, *Obscene Contracts: The Doctrine of Unconscionability and Hospital Billing of the Uninsured*, 94 Ky. L.J. 101, 104 (2005) ("The labels for these charges, 'regular,' 'full,' or 'list,' are misleading, because in fact they are actually paid by less than five percent of patients nationally."); *Temple Univ. Hosp., Inc. v. Healthcare Mgmt. Alternatives, Inc.*, 832 A.2d 501, 508-09 (Pa. Super. Ct. 2003) (hospital was paid its list prices in only one to three percent of its cases); *Vencor Inc. v. Nat'l States Ins. Co.*, 303 F.3d 1024, 1029 n.9 (9th Cir. 2002) (providers' standard rates are paid only "by a small minority of patients").  One hospital's Chief Medical Officer referred to these prices as "Disneyland numbers."  John Carreyrou, *As Medical Costs Soar, The Insured Face Huge Tab*, WALL ST. J., Nov. 29, 2007, at A1, copy attached as Exhibit 2 to the Motion.

explained that paying the list prices "would give [the insured] a benefit *based on a fictional amount* and lead to an absurd result." *Id.* (emphasis added); *see also Claybrook v. Central United Life Ins. Co.*, 387 F. Supp. 2d 1199, 1204 (M.D. Ala. 2005) (rejecting similar claim and holding that "actual charges" means the amount the "chemotherapy providers accepted in full and final payment for their services"). The *Claybrook* decision is particularly relevant given that plaintiff's claims are governed by Alabama law. *See infra* pp. 16-18.

The plaintiff here was diagnosed with prostate cancer in June 2006 and submitted claims under the Policy for services and treatments provided to him from May 2006 through September 2006.[5]  Transamerica paid plaintiff total benefits of $5,523.38 under the Policy. Byrne Decl. ¶ 12. Plaintiff submitted no additional claims, and he cancelled his Policy in October 2010. *Id.* ¶¶ 9, 18. While plaintiff makes general allegations about Transamerica's payment of benefits based on "actual charges," the only specific example in the Complaint of an allegedly underpaid claim is the Surgery and Anesthesia Claims described in paragraph 42. *See* Complaint ¶¶ 41-42.

The Complaint alleges generally that plaintiff was diagnosed with cancer and underwent treatments for which he "incurred charges and was billed" (*id.* ¶ 41), and that he "submitted proofs of loss" and "medical bills" under the Policy. *Id.* ¶ 42. Specifically, plaintiff complains that he was paid only "$1,483.58 in benefits for surgery," but that the "actual charges" for the surgery were really $4,166.00, and therefore he should have been paid $1,700.00—the maximum allowable under the Policy (the "Surgery Claim").[6]  In addition, plaintiff alleges that the Policy

---

[5] Declaration of James A. Byrne ¶¶ 7, 9 ("Byrne Decl."), copy attached as Exhibit 3 to the Motion.

[6] Complaint ¶ 42. Plaintiff acknowledges that the surgery benefit is subject to a "cap" of $1,700. *Id.* (conceding "the most Plaintiff Hall could have (and should have) received was $1,700, the maximum amount for surgery available under the policy").

provides an anesthesia benefit equal to "25% of the cost of surgery," and therefore he should have been paid $425 for the anesthesia (25% of $1,700), but that he was paid only $370 for the anesthesia benefit (the "Anesthesia Claim"). *Id.* ¶ 42. These Surgery and Anesthesia Claims are the only specific contractual claims pled in the Complaint.

As demonstrated below, the record is now undisputed that the Surgery Claim is based on a prostate surgery performed by Dr. Stanley Wade at Rush Foundation Hospital on July 27, 2006, and the actual amount charged, owed, and paid for the surgery was $1,483.58, which is exactly what Transamerica paid to plaintiff for the Surgery Claim. *See* Declaration of Kathy Holdiness ¶ 12 ("Holdiness Decl."), copy attached as Exhibit 4 to the Motion. Plaintiff is now, and was at the time of his surgery, covered by Medicare with secondary insurance coverage through a United Healthcare plan. Holdiness Decl. ¶¶ 6, 7. The medical provider's billing company has attested that "Medicare regulations dictated the amounts that [plaintiff's] physicians could bill or charge to Mr. Hall" for the services he received. *Id.* ¶ 6. While the "list price" or "maximum rate" for plaintiff's surgery may have been $4,166.00, the evidence is now undisputed that the provider "did not charge its maximum rates to Mr. Hall." *Id.* ¶ 12. Instead, the "total fee to Mr. Hall for this surgery was $1,483.58, which was the Medicare Allowed Amount." *Id.* "Medicare paid $1,186.86, and United Healthcare paid the balance of $296.72." *Id.* Thus, the "loss incurred" and the "actual fee" for the Surgery Claim was $1,483.58. Moreover, plaintiff has not submitted any "proof of loss" demonstrating any "incurred expense" greater than $1,483.58 for the Surgery Claim. Plaintiff also conceded at his deposition that his

doctor received $1,483.58 for the surgery, and he had no expectation of receiving benefit payments under the Policy of more than the amount his doctor was paid.[7]

With respect to the Anesthesia Claim, plaintiff's proof of loss documentation shows that the "actual charges" for the Anesthesia Claim were $189.11.  Byrne Decl. ¶ 15.  The Policy provides that Transamerica "will pay the actual charges for anesthesia *not to exceed* 25% of the surgical fee."  Policy, Section E, ¶ 5 (emphasis added).  Because Transamerica paid plaintiff $370.90 (25% of $1,483.58), which was more than the actual charges for the anesthesia, plaintiff was not underpaid for the Anesthesia Claim.   In sum, there are no genuine issues of fact regarding the "actual charges" or "actual fee" for the Surgery and Anesthesia Claims pled in the Complaint, and Transamerica has paid all of the benefits due under the Policy for these claims. Plaintiff has not and cannot demonstrate a "loss incurred" or "incurred expense" in an amount greater than the benefits already paid by Transamerica for these claims.  For all of these reasons and those set forth below, the Court should grant summary judgment in favor of Transamerica with respect to all claims pled in the Complaint.

<u>STATEMENT OF UNDISPUTED MATERIAL FACTS</u>[8]

**The Policy**

On September 17, 1994, plaintiff Robert W. Hall, an Alabama resident, applied in Linden, Alabama for a "Cancer Expense Policy" from Equity National.[9]  Equity National issued

---

[7] *See* Deposition of Robert W. Hall, December 14, 2010, at 204, 209 ("Hall Dep.") (Q. "And do you think that you were entitled to get paid more than your doctor got paid for any particular service or treatment?"  A.  "No, ma'am, but that's not the point - I mean that's not the question.").  Relevant excerpts of the plaintiff's deposition are attached as Exhibit 5 to the Motion.

[8] Pursuant to Local Rule 56.1, a separate Statement of Undisputed Material Facts is filed contemporaneously with Transamerica's Motion for Summary Judgment.

Cancer Policy number 01E122807 to plaintiff effective September 17, 1994 on policy form

EPC530.  The Policy insures only for "loss incurred":

> We agree to insure you for *loss incurred*, while this policy is in force,
> from Cancer first Positively Diagnosed after the "waiting period", subject
> to the provisions on the following pages of this policy.

Policy at p. 1 (emphasis added).  In order to receive benefits under the Policy, the insured must

submit a written "proof of loss" for each "incurred expense."  Policy, Section C, at p. 6 ("Benefit

payments will be made directly to the Insured . . . for *losses incurred* by any Covered Person

under this policy.  *Proof of loss* must be submitted to us for each *incurred expense*.") (emphasis

added); *see also* Policy, Section K, ¶ 8, at p. 15 ("Written proof of loss must be given to us

within ninety (90) days after the date of such loss."), and Policy, Section K, ¶ 9, at p. 15

("Indemnities payable under this policy will be paid as soon as we receive proper written proof

of loss.").[10]

Certain benefits in the Policy are subject to a limit or "cap."[11]  The Policy cover page

states in large bold font "***THIS IS A LIMITED POLICY – READ IT CAREFULLY***"

---

[9] The Policy is described as a Cancer Expense Policy on the Application (Whitlock Decl., Exh. B at p. TLIC00154) and on the Policy Schedule Page (*id.* at p. TLIC00135).

[10] Plaintiff admits that he did not review the Policy when he received it (Q. "When you received the policy in the mail, did you read it?"  A. "No ma'am, not really. . . ."), nor did he recall reading it during the ensuing ten days during which he was permitted to return the Policy for a full refund (Q. . . . "'Notice of 10-day right to examine policy.'  Do you see that?"  A. "Yes, ma'am."  Q. "And it says under that if you're not satisfied with the policy, you could return it for a full refund of your premium.  Did you read that when you received the policy?"  A. "I may have, but I don't remember."  Q. "Did you call anyone at the company with any questions you had about any parts of the policy that you didn't understand?"  A. "No ma'am."). Hall Dep. at 97-99.  Plaintiff acknowledges, however, that he is bound by the Policy, despite his failure to read it.  *Id.* at 97-98.

[11] *See, e.g.*, Policy, Section E, ¶ 1 (paying the "actual charges" for certain drugs and medicines up to the greater of $250 per hospital confinement or $25 times the number of days of
*(footnote continued on next page)*

(capitalization and emphasis in original).  Several benefits in the Policy are based on the "actual charges" or "actual fee" for medical treatment or other non-medical services such as ambulance transportation.  The Policy provisions covering the Surgery and Anesthesia Claims provide in relevant part:

> **4. SURGERY**
>
> We will pay the *actual fee* for a surgical operation . . . *not to exceed* the amount shown for that operation in the SCHEDULE OF OPERATIONS (pages 11-12) while you are Hospital Confined. . . .
>
> **5. ANESTHESIA**
>
> While you are Hospital Confined, we will pay the *actual charges* for anesthesia *not to exceed* 25% of the surgical fee, per procedure/operation, as determined by: . . . Item 4, "Surgery," in this section. . . .

Policy, Section E, ¶¶ 4, 5, at p. 6 (emphasis added).  The Policy does not define the terms "actual charges" or "actual fee" but uses the words consistent with their plain and ordinary meaning and consistent with the Policy's expressed intent to provide insurance coverage for "loss incurred." Whitlock Decl. ¶¶ 6-7.  Because Mr. Hall did not read the Policy when it was delivered to him, *see supra* note 10, he was unaware of the scheduled benefits in the Policy, and the provision on the front page which specified in bold lettering that the Policy was a "***LIMITED POLICY***." Hall Dep. at 97, 99.

The Policy is guaranteed renewable so long as the premiums are timely paid.  Premium rates are subject to periodic increases.  *See* Policy at 1.

---

hospital confinement); *id.* ¶ 2 (paying "actual charges" for certain laboratory tests up to $150 per hospital confinement, or up to $300 prior to confinement).

**"Chargemasters" and "List Prices"**

Today "[e]very hospital maintains a file system known as the chargemaster, which contains all billable procedure codes performed at the hospital, along with descriptions of those codes and the hospitals' own list prices."[12]   As explained by one leading expert, "[o]ur health care system has become increasingly complex over time resulting in ... a system that lacks transparency ... especially with regard to medical pricing and billing documentation." Declaration of Glenn Alan Melnick, Ph.D. ¶ 4 ("Melnick Decl."),[13] copy attached as Exhibit 6 to the Motion.  The healthcare industry has seen "the evolution of what appears to be two sets of often highly divergent prices for medical services":

> One set reflects "list prices," which are not the real prices at all and are rarely if ever actually paid; the other set reflects actual charges or real prices, which are the amounts that providers actually request to be paid, collect and accept as payment in full.  The amounts generally listed on provider statements to patients are based on a providers' "charge master," a database containing a list of the different services along with the list prices, which are "marked-up" above the actual or real prices that providers actually bill and are paid.

Melnick Decl. ¶ 6.  The "list prices" in the "chargemasters" of many hospitals and other medical providers are grossly inflated and can be many multiples of the actual prices being charged and paid:

---

[12] Christopher P. Thompkins, Stuart H. Altman, and Efrat Eilat, *The Precarious Pricing System for Hospital Services,* 25 Health Affairs 45, 48 (2006).

[13] Glenn Alan Melnick, Ph.D. currently holds the Blue Cross of California Chair at the University of Southern California.  He is a nationally recognized expert on health care markets, economics, and pricing.  *See* Melnick Decl. at 1-2; *see also Pipes v. Life Investors Ins. Co. of Am.*, 254 F.R.D. 544, 547 n.2 (E.D. Ark. 2008) (citing Professor Melnick and noting his testimony that "healthcare providers inflate list prices as a means to negotiate real or actual charges"); *id.* at 550 (citing Professor Melnick's testimony that "linking health insurance benefit payments to list prices on provider statements would likely result in 'larger than market' premium increases").

> Many hospitals and other medical providers maintain a "chargemaster" database or similar databases which contain the provider's maximum "list prices" for their various services. These list prices can be grossly inflated above legitimate market prices and they are generally not the actual prices billed, charged, and collected for the medical services rendered to most patients.

Declaration of Marc Chapman ¶ 6 ("Chapman Decl."), copy attached as Exhibit 7 to the Motion.

The difference between actual charges and list prices "has accelerated dramatically in recent years." Melnick Decl. ¶ 15. List prices in some cases can be three, four, or more than five times higher than the amounts that medical providers are actually charging and being paid for the treatments and services provided. *See* Declaration of Stephen Gwin ¶ 4 ("Gwin Decl."), copy attached as Exhibit 8 to the Motion; Melnick Decl. ¶ 15.

> Because list prices are not the basis on which most transactions are paid, these prices are not tied to the marketplace in an economically meaningful way. Generally, providers can unilaterally raise the amounts in their charge masters at any time and to any level they choose without concern that there will be negative feedback from the market since the vast majority of transactions are not adjudicated based on payment of charge master amounts.

Melnick Decl. ¶ 8. In addition, because "list prices are not the basis on which transactions are adjudicated, they do not represent the true or actual loss in most instances." Melnick Decl. ¶ 9; *see also* Gwin Decl. ¶ 4 ("The documents or statements issued by medical providers which include 'list prices' are not genuine 'bills' and do not reflect an incurred expense or incurred loss, unless they contain a demand for payment or reflect an amount owed that must be paid, and then only to the extent of the amount that must be paid.").

### Payment of "Actual Charges" Benefits and Plaintiff's Claims

In 2004, Life Investors and Transamerica began investigating the causes of premium rate increases to their policyholders and discovered they had been overpaying some claims for "actual charges" because insureds were submitting documents as proof of loss that contained

"list prices," instead of the actual amounts being billed, charged, and paid for medical treatment. Whitlock Decl. ¶ 10; Gwin Decl. ¶ 3.  In early 2006, Transamerica revised its claim forms and "proof of loss" instructions to ensure it would receive proper documentation and information to enable it to accurately pay "actual charges" going forward according to the total amounts actually owed to and accepted by medical providers as payment in full for the services rendered. Whitlock Decl. ¶¶ 13-14.  Transamerica's methodology is consistent with *all* state statutes defining "actual charges."[14]

On February 10, 2006, Transamerica sent a letter to plaintiff enclosing a copy of its updated Claim Forms and Instructions (the "2006 letter").  Byrne Decl. ¶ 5 & Exh. A.  The 2006 letter explained the meaning of "actual charges" as used in the Policy, the difference between "actual charges" and "list prices," and what type of "proof of loss" would be required under the Policy to support a claim for benefits based on actual charges. Whitlock Decl. ¶ 13 & Exh. D.

On June 5, 2006, plaintiff was diagnosed with prostate cancer.  Byrne Decl. ¶ 7 & Exh. B.[15]  Plaintiff testified at his deposition that he called Transamerica to request a claim packet.  Hall Dep. at 116.  Plaintiff then submitted an Attending Physician's Statement, a

---

[14] Five states have enacted statutes governing payment of policy benefits based on the "actual charges" or "actual fee" for medical services.  *See* S.C. CODE ANN. § 38-71-242(A)(1) (2008) (providing that the terms "actual charge," "actual charges," "actual fee," or "actual fees," when used in a specified disease insurance policy, shall mean the amount the healthcare provider agreed to accept or is obligated by operation of law to accept as payment in full for the services provided to the insured); MO. REV. STAT. § 376.789(1)(2) (2009) (same for "actual charge" and "actual fee"); TEX. INS. CODE ANN. § 1201.0601 (2005) ("actual charge" or "actual fee" means "the amount actually paid by or on behalf of the insured and accepted by a provider for services provided"); OKLA. STAT. ANN. tit. 36, § 3651(A) (2006) (same); GA. CODE ANN. § 33-24-16.1(a) (2006) ("actual charge" or "actual fee" means "the amount actually paid by or on behalf of an insured person and accepted as full payment by a health care provider or other designated person for the goods or services provided").

[15] *See also* Hall Dep. at 135.  The Complaint incorrectly alleges that plaintiff was diagnosed with cancer in May 2007.  Complaint ¶ 41.

Claimant's Statement, and a pathology report, which Transamerica received on July 20, 2006.

Byrne Decl. ¶ 7.  Plaintiff's initial claim submission included no proof of loss for any incurred

expenses.  *Id*.  It included a handwritten note stating that plaintiff would be undergoing prostate

surgery by Dr. Stanley Wade on July 27, 2006 at Rush Foundation Hospital in Meridian,

Mississippi.  *Id*.  On August 4, 2006, Transamerica sent plaintiff a notice thanking him for the

pathology report and requesting that he submit proof of loss in the form of itemized bills and

explanation of benefit forms (EOBs) from his insurance carrier.  Byrne Decl. ¶ 8.

Transamerica received no proof of loss or further documentation from plaintiff for over

seven months.  Byrne Decl. ¶ 9.  In late March 2007, plaintiff submitted his proof of loss

information to Transamerica, which included multiple statements, Medicare Summary Notices,

and United Healthcare EOBs related to his cancer treatment.  *Id*.  All of plaintiff's claims were

for services and treatments provided to him from May 2006 through September 2006.  *Id*.

Plaintiff's submission included documentation relating to his prostate surgery and anesthesia at

Rush Foundation Hospital on July 27, 2006.  *Id*.  This submission in March of 2007 was the last

submission of claims by plaintiff under his Policy.  *Id*.  In October of 2010, plaintiff cancelled

his Policy and it is no longer in force.  *Id*. ¶ 18; *see also* Hall Dep. at 186.

### Plaintiff's Surgery and Anesthesia Claims

Plaintiff in this case was covered by Medicare with secondary coverage provided by

United Healthcare.  Chapman Decl. ¶ 7.  As a result, most of the actual charges for plaintiff's

medical treatment were paid by Medicare, and part of those charges were paid by United

Healthcare in the form of deductibles, co-payments, or co-insurance.  *Id.* ¶ 12.  Mr. Hall "[v]ery

seldom" pays anything for his healthcare.  Hall Dep. at 206 ("I don't remember the last one I did

pay.").  With respect to the prostate surgery performed by Dr. Wade at Rush Foundation Hospital

on July 27, 2006, the "actual charges" were paid by Medicare and United Healthcare.  Chapman

Decl. ¶ 14.  Specifically, Medicare paid $1,186.86, and United Healthcare paid $296.72 (for a total of $1,483.58) for the surgery.  *Id.* ¶ 14; Holdiness Decl. ¶ 12; Hall Dep. at 204-05 (Q.  ". . . And is it your understanding that the $1,483.58 is what Dr. Wade was actually paid for the surgery?"  A. "Yes, ma'am."  Q. "And below that it shows Medicare paid $1,186.86 --" A. "Yes, ma'am."  Q.  "– and that United Healthcare paid the balance covered by your plan of $296.72, is that correct?"  A. "Yes, ma'am.").  This total fee of $1,483.58 for the Surgery Claim was exactly equal to the Medicare Allowed Amount for this procedure.  Holdiness Decl. ¶ 12; Chapman Decl. ¶ 14; Byrne Decl. ¶ 14.

Kathy Holdiness, the Director of Customer Service for Management Services Organization, the entity responsible for billing the Surgery Claim for Dr. Wade, attested that the actual fee charged for the Surgery Claim was $1,483.58, and that the provider *did not charge* the maximum list price of $4,166 in this case.  Holdiness Decl. ¶ 12.  At his recent deposition, plaintiff agreed.  Hall Dep. at 204-05 (Q. "…And is it your understanding that the $1,483.58 is what Dr. Wade was actually paid for the surgery?"  A. "Yes, ma'am.").  Ms. Holdiness testified in pertinent part as follows:

> 6. … In 2006 and continuing through 2008, Robert Hall was covered by Medicare.  Medicare regulations dictated the amounts that Management Services Organization physicians could bill or charge to Mr. Hall for the covered services and treatments he received as a Medicare-eligible patient, also known as the "Medicare Allowance." … *Management Services Organization did not charge Mr. Hall for any amount beyond the Medicare Allowance.*

> 7. In addition to his Medicare eligibility, Mr. Hall was covered by a UnitedHealthcare Railroad Plan.  Because Mr. Hall was also covered by Medicare, Management Services Organization was not permitted to bill either Mr. Hall or UnitedHealthcare for any amounts greater than Mr. Hall's portion of the Medicare Allowance.

> 8. Management Services Organization is not permitted to bill or charge a Medicare insured whatever amount it chooses to bill for covered services; instead Management Services Organization … has agreed to

accept certain Medicare "Allowances" as payment in full by Medicare and the Medicare insured for covered services provided to the Medicare insured. *No amount in excess of the Medicare Allowance can be billed or charged by Management Services Organization* to the Medicare insured, Medicare, or any other insurance plan owned by the Medicare insured for covered services, such as a UnitedHealthcare Plan.

* * *

10. When a Medicare insured receives services or treatments, the total amount that Management Services Organization can collect from Medicare and the Medicare insured for covered services to the Medicare insured cannot exceed the Medicare Allowance, which is the *maximum amount that could ever be owed* to Management Services Organization by the Medicare insured, Medicare, or any other insurance owned by the Medicare insured under the terms of the Agreements.

11. Management Services Organization abides by Medicare regulations *and does not bill any Medicare insured more than the Medicare Allowance* for any treatments or services provided at Management Services Organization. . . .

12. On July 27, 2006, Management Services Organization physician Dr. Stanley A. Wade performed prostate surgery on Mr. Hall. Although Management Services Organization's maximum rate for treatment related to the surgery was $4,166.00, *the total fee to Mr. Hall for this surgery was $1,483.58*, which was the Medicare Allowed Amount. Medicare paid $1,186.86, and UnitedHealthcare paid the balance of $296.72. Under federal law, neither Medicare nor Mr. Hall or UnitedHealthcare were obligated to Management Services Organization or Dr. Wade for any amount in excess of the $1,483.58 Medicare Allowed Amount. Management Services Organization *did not charge its maximum rates to Mr. Hall* and did not otherwise attempt to obtain any payments from Mr. Hall or UnitedHealthcare in excess of the Medicare Allowed Amount.

Holdiness Decl. ¶¶ 6-8, 10-12 (emphasis added). It is undisputed that Transamerica paid the

plaintiff $1,483.58 for the Surgery Claim. Byrne Decl. ¶ 14. This is exactly equal to the amount

actually charged, owed, paid, and accepted as payment in full by the provider for the surgery

services. Hall Dep. at 204-05. In addition, the record is devoid of any evidence that plaintiff

suffered a "loss incurred" or submitted proof of any "incurred expense" exceeding $1,483.58 for

his Surgery Claim.

With respect to plaintiff's Anesthesia Claim, the documents plaintiff submitted as proof of loss show that the actual amount charged, owed, paid, and accepted as payment in full for the anesthesia was $189.11.  Byrne Decl. ¶ 15.  Transamerica, however, paid plaintiff $370.90 for the Anesthesia Claim, which was an overpayment of $181.79.  Byrne Decl. ¶ 15.[16]  Transamerica paid the Surgery and Anesthesia Claims on April 12, 2007.  Byrne Decl. ¶ 10 & Exh. D.

In July 2007, Transamerica received notice from the Alabama Department of Insurance that plaintiff had complained he had not been "fairly compensated" for his March 2007 claim submission.  Byrne Decl. ¶ 11.[17]  Plaintiff apparently wanted to be paid the sum total of all amounts listed on every slip of paper he submitted to Transamerica without regard to the Policy's benefit provisions.  Hall Dep. at 161-62.

> Q.     So essentially you're saying any amounts that were listed on the statements that you received and sent to the company from the doctor and the hospital, you expected to be paid those amounts in full?
>
> A.     Yes, Ma'am.

Hall Dep. at 161.  Plaintiff had no understanding that there were specific benefits listed in the policy. Hall Dep. at 162 (Q. "You didn't have any understanding that there were specific benefits listed in the policy . . ."  A. "No, ma'am, I wasn't aware of that.").  Plaintiff made no attempt to compare the explanation of benefits form he received from Transamerica to the terms

---

[16] The Policy provides that Transamerica "will pay the actual charges for anesthesia *not to* exceed 25% of the surgical fee."  Policy, Section E, ¶ 5 (emphasis added).  Transamerica paid the 25% maximum benefit of $370.90 (25% of $1,483.58).

[17] Transamerica reexamined plaintiff's claims, and on July 9, 2007, issued an additional payment of $737.50 to plaintiff for three additional benefit types.  *Id.* ¶ 11 & Exh. E.  This payment did not relate to the Surgery or Anesthesia Claims, which had previously been paid in full.  Byrne Decl. ¶ 10 & Exh. D.

of his Policy.  Hall Dep. at 162 ("I just reviewed the [explanation of benefits] form.  I didn't compare the policy.").[18]

After reviewing Hall's Policy and claims and Transamerica's response, the Alabama Department replied to plaintiff as follows:

> [Transamerica] paid surgical benefits based on what Medicare had approved for it.  The policy paid the maximum benefit of $200.00 per day for each day you were in the hospital, ***according to the policy provisions. All other benefits were paid according to the policy schedule***.  We are sorry you[r] policy could not pay more toward your claims but due to it being a Limited Benefits Contract it does not.

Letter from Alabama Department of Insurance to Robert W. Hall, dated August 1, 2007, copy attached hereto as Exhibit 9 to the Motion (emphasis added).  Although plaintiff did not agree with the Alabama Department of Insurance's analysis of his claims, plaintiff decided he "wasn't going to do anything" else.  Hall Dep. at 179.  This lawsuit was filed after plaintiff received a solicitation call from an attorney named Hutsler who "saw where I had contacted the Alabama Insurance Commissioner."  Hall Dep. at 49 (Q. "And he just called you out of the blue?" A.  "Yes, ma'am.").[19]

---

[18] Based on plaintiff's failure to read his Policy or request any explanation of its provisions after receiving it (Hall Dep. at 97-99), plaintiff believed he should have been paid approximately $27,000 for his claims.  Hall Dep. at 125.

[19] Mr. Hutsler has never appeared in this action, although plaintiff testified he is still represented by Mr. Hutsler.  Hall Dep. at 50.  According to plaintiff, Mr. Hutsler hired counsel of record Tomlinson who plaintiff "only met . . . yesterday [December 13th]."  Hall Dep. at 56. Plaintiff is unaware that he is represented by any of the other four attorneys who have appeared in this case.  *Id*.  Plaintiff has never spoken to any attorneys in Arkansas, and has no idea why this lawsuit was filed in Arkansas; he has no idea why this case was filed as a class action; and he had no intention of representing anyone other than himself when he spoke to Mr. Hutsler. Hall Dep. at 56, 59-61.

<u>LEGAL STANDARD</u>

Rule 56 allows a party to move for summary judgment on any claim or part of a claim. Fed. R. Civ. P. 56(a) (as amended Dec. 1, 2010). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Shelter Ins. Cos. v. Hildreth*, 255 F.3d 921, 924 (8th Cir. 2001); *Lexicon, Inc. v. Ace Am. Ins. Co.*, 2010 WL 79479, at *1 (E.D. Ark. Jan 7. 2010). After the movant bears the initial burden of demonstrating the absence of genuine issues of material fact, the burden is on the non-moving party to designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Yoder v. Safeco Ins. Co. of Am.*, 2006 WL 568329, at *1 (E.D. Ark. Mar. 7, 2006) (citation omitted). An issue is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. Summary judgment is "regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex,* 477 U.S. 317 at 327 (citing Fed. R. Civ. P. 1). Because there are no genuine issues of material fact with respect to the claims pled in the Complaint, this Court should grant summary judgment in favor of Transamerica.

<u>ARGUMENT</u>

I.   ALABAMA LAW GOVERNS PLAINTIFF'S CONTRACT CLAIMS IN THIS ACTION

When a federal court exercises diversity jurisdiction, it applies the forum state's choice of law rules to the parties' dispute. *See, e.g.*, *U.S. Fire Ins. Co. v. Kresser Motor Serv., Inc.*, 26

F.3d 91, 94 (8th Cir. 1994) (citing *Whirlpool Corp. v. Ritter*, 929 F.2d 1318, 1320 (8th Cir. 1991)).  In insurance coverage cases such as this, Arkansas' choice of law rules provide that the parties' dispute is governed by the substantive law of the state in which the insurance contract was made.  *Id.*  "Arkansas choice-of-law rules also apply the law of the state with the most significant relationship to the issue in a contract dispute."  *Id.*; *Scott v. Allstate Ins. Co.*, 2005 WL 1883687, at *1 n.1 (E.D. Ark. Aug. 8, 2005) ("In contract actions, Arkansas Courts have applied the 'significant contacts' test, which requires an inquiry into the nature and quantity of each states' contacts with the transaction at issue.").

In this case, the Policy was made in Alabama, and there can be no dispute that Alabama has the most significant relationship to the dispute.  Plaintiff is a citizen of and resides in the State of Alabama.  Complaint ¶ 12.  Plaintiff applied for the Policy in 1994 in Linden, Alabama, and the Policy was delivered to plaintiff in Alabama.  Whitlock Decl., Exh. B; Byrne ¶¶ 16-17.  All EOBs, checks, and other correspondence, including the 2006 letter providing plaintiff with the updated proof of loss forms and instructions, were mailed to plaintiff in Alabama, and plaintiff submitted his claims to Transamerica from Alabama.  Byrne ¶ 17.  Plaintiff also filed a complaint with the Alabama Department of Insurance regarding the payment of benefits under his Policy.  Byrne ¶ 11.  Consequently, the insurance contract was made in Alabama, and Alabama has the most significant contacts with this dispute.  Alabama law governs plaintiff's claims.  *See, e.g.*, *Scott*, 2005 WL 1883687, at *1 n.1 (applying Arkansas law to policy issued in Arkansas to Arkansas resident); *Lienemann v. King*, 26 F.3d 126, 1994 WL 263814, at *1 (8th Cir. May 23, 1994) (applying Kansas law where insured resided in Kansas at the time the policy

was issued and at the time of the loss).[20]

## II. TRANSAMERICA IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CONTRACT CLAIMS RELATING TO PLAINTIFF'S SURGERY AND ANESTHESIA BECAUSE TRANSAMERICA HAS FULLY PAID THE BENEFITS FOR THOSE CLAIMS

Plaintiff alleges that his Policy requires Transamerica "to pay certain benefits in full to Plaintiff Hall including benefits based on 'actual charges' incurred ... for the treatment of cancer" (Complaint ¶ 44), but that Transamerica breached the contract by "refus[ing] to pay such claims in accordance with the terms of the contract." Complaint ¶ 46. Specifically, the Complaint alleges that plaintiff's Surgery and Anesthesia Claims were underpaid. Complaint ¶ 42. The record shows, however, that Transamerica paid plaintiff $1,483.58, which was the actual fee for the Surgery Claim. Byrne Decl. ¶ 14. This was the maximum amount Dr. Wade was permitted to charge or bill for this surgery under federal Medicare regulations and, as Ms. Holdiness attested and plaintiff conceded at his deposition, this was in fact the actual fee that Dr. Wade did charge and was paid. Holdiness Decl. ¶ 12; Hall Dep. at 204.

The Complaint alleges that plaintiff should have received a payment of $1,700.00 for the surgery. Complaint ¶ 42; *see also* Hall Dep. at 112-113. The Surgery provision of plaintiff's Policy provides that Transamerica "will pay the ***actual fee*** for a surgical operation . . . ***not to exceed***" the maximum amount shown in the Schedule of Operations. Policy, Section E ¶ 4, page 6 (emphasis supplied). There is no dispute that the maximum benefit for this surgery was $1,700. *See* Policy at Section E, page 11, Schedule of Operations (providing maximum benefit

---

[20] In addition, the Policy itself expressly contemplates that it will be governed by the law of the State where the insured resides on the effective date. *See* Policy, Section K, ¶ 13, at p. 16 ("Any provision of this Policy which, on its Effective Date, is in conflict with the laws of the *state in which the Insured resides* on such date is hereby amended to conform to the minimum requirements of such laws.") (emphasis added).

of $1,700 for "Prostatectomy, radical").   In his Complaint, plaintiff asserts he was owed the maximum of $1,700 because the actual charges for his surgery were $4,166.00.[21]   Plaintiff further alleges in the Complaint that he was underpaid for the Anesthesia Claim, which according to plaintiff, should have been 25% of $1,700, rather than the benefit he received, which was 25% of the doctor's actual fee of $1,483.58.   The record is now clear, however, that plaintiff was not charged $4,166.00 for the surgery.   Hall Dep. at 204; Holdiness Decl. ¶ 12.

The undisputed record evidence in this case establishes that the amount actually owed, billed, charged, paid and accepted as payment in full by Dr. Wade for the surgery was $1,483.58; and that $4,166.00 was a "list price" or maximum rate for the surgery, which was not "charged" to anyone.   Holdiness Decl. ¶ 12; Chapman Decl. ¶ 14; Byrne Decl. ¶ 14; Hall Dep. at 204.   Dr. Wade's billing company submitted a sworn declaration in this case attesting that Dr. Wade "did not *charge* [his] maximum rates [of $4,166.00] to Mr. Hall and did not otherwise attempt to obtain any payments from Mr. Hall or UnitedHealthcare in excess of the Medicare Allowed Amount" and that "the *total fee* to Mr. Hall for this surgery was $1,483.58."   Holdiness Decl. ¶ 12 (emphasis added).   Indeed, any effort by the medical provider to charge or collect an amount greater than the Medicare Allowed Amount would have violated federal Medicare law. Holdiness Decl. ¶ 8; Chapman Decl. ¶¶ 8-11.[22]   In addition, Transamerica paid plaintiff $370.90

---

[21] This allegation is inconsistent with plaintiff's sworn deposition testimony.  Hall Dep. at 204-05 (conceding his doctor was paid $1,453.58, and that he did not expect to be paid more than his doctor).

[22] The American Medical Association Code of Ethics prohibits charging an "illegal" or "excessive fee" and provides as an example "when a physician accepts an assignment as full payment for services rendered to a Medicare patient and then bills the patient for the additional amount."   Council on Ethical and Judicial Affairs, Code of Medical Ethics of the American Medial Association, Current Opinions with Annotations, ¶ 6.05 at p. 167 (2006-2007 Ed.). Dr. Wade's billing provider has presented evidence in this case that, consistent with this Code,

*(footnote continued on next page)*

for the Anesthesia Claim, which exceeded the amount that was owed to plaintiff under the Policy.  Byrne Decl. ¶ 15.

The undisputed evidence demonstrates that Transamerica has fully paid plaintiff all benefits due under the Policy for the Surgery and Anesthesia Claims.  Because there are no genuine issues of material fact remaining, Transamerica is entitled to summary judgment in its favor on those claims.  *See Claybrook*, 387 F. Supp. 2d at 1204 (applying Alabama law and holding that actual charges "are charges actually billed to the patient (or their insurance provider) when medical services are rendered; such actual charges may be higher or lower depending upon whether the patient is a Medicare recipient").

III.   PLAINTIFF'S POLICY CANNOT BE REASONABLY CONSTRUED TO REQUIRE TRANSAMERICA TO PAY BENEFITS BASED ON "LIST" PRICES THAT ARE NOT BEING BILLED, CHARGED, OR PAID

To the extent that plaintiff contends that the "actual charges" or "actual fee" for his prostate surgery is the provider's "list price" of $4,166.00—notwithstanding that this amount was not incurred, owed, billed, charged or paid by anyone—his claims should be rejected as a matter of law.  Plaintiff's position ignores the plain and ordinary meaning of "actual charges" as used in the Policy, and further ignores that the Policy insures only for "loss incurred."  Because plaintiff's construction of the Policy cannot stand as a matter of law, summary judgment on plaintiff's breach of contract claim is proper.

A.     Under Alabama Law, The Policy Must Be Interpreted According To Its Plain and Ordinary Meaning

Under Alabama law, "[i]f a word or phrase is not defined in the policy, then the court should construe the word or phrase according to the meaning a person of ordinary intelligence

---

Dr. Wade made no attempt to bill plaintiff for any amounts in excess of the Medicare approved amount.  Holdiness Decl. ¶¶ 8, 11-12.

would reasonably give it." *Safeway Ins. Co. of Ala. v. Herrera*, 912 So. 2d 1140, 1143 (Ala. 2005); *Liggans R.V. Ctr. v. John Deere Ins. Co.*, 575 So. 2d 567, 569 (Ala. 1991) ("words [in an insurance contract] are given the meaning that persons with a usual and ordinary understanding would place on the words") (citation and internal quotations omitted); *Pritchett v. State Farm Mut. Auto. Ins. Co.*, 834 So. 2d 785, 791 (Ala. Civ. App. 2002). "It is well settled in Alabama that when a court is interpreting the language in an insurance contract, rules of construction mandate that words are to be given their customary and normal meaning." *Sullivan v. State Farm Mut. Auto. Ins. Co.*, 513 So. 2d 992, 994 (Ala. 1987). "Insurance contracts, like other contracts, are not to be construed so technically as to defeat the intention of the parties, but are to be given a rational and practical construction." *Ala. Farm Bureau Mut. Casualty Ins. Co.  v. Preston*, 253 So. 2d 4, 6 (Ala. 1971); *Safeway Ins.*, 912 So. 2d at 1143 ("The court should not define words it is construing based on technical or legal terms."); *Am. Nat'l Prop. & Cas. Co. v. Blocker*, 165 F. Supp. 2d 1288, 1295 (S.D. Ala. 2001) ("Where the terms of the policy are clear, courts may not rewrite the terms of a policy or interpret unambiguous policy language to provide coverage that was not intended by the parties."). "[T]he parties cannot create ambiguities by setting forth different interpretations or by inserting strained or twisted reasoning." *Safeway Ins.*, 912 So. 2d at 1143 (citation and internal quotations omitted).

The Alabama district court's decision in *Claybrook v. Central United Life Insurance Co.*, 387 F. Supp. 2d 1199 (M.D. Ala. 2005), is directly on point. In *Claybrook*, the plaintiffs claimed that their insurer had breached their supplemental cancer insurance policy by not paying sufficient benefits for the "actual charges" of certain chemotherapy treatments provided to Mrs. Claybrook. Mrs. Claybrook was covered by Medicare. The Medicare allowed amount for the chemotherapy treatments was $16,351.91, but the physician's "list price" or maximum rate for such treatment was $26,361. *Id.* at 1202. The Claybrooks were paid cash benefits of

$16,351.91 − exactly equal to the amount the medical provider was required to accept and did accept as payment in full from Medicare for the chemotherapy services. *Id.* Nevertheless, the Claybrooks claimed that Central United Life Insurance Company breached the insurance contract by not paying them "actual charges" according to the higher list price. *Id.*

The *Claybrook* court rejected plaintiffs' claim, holding that "actual charges" is unambiguous "when given its ordinary and plain meaning in the context of the policy."[23] *Id.* at 1204. The court further explained that actual charges "are charges actually billed to the patient (or their insurance provider) when medical services are rendered; such actual charges may be higher or lower depending upon whether the patient is a Medicare recipient." *Id.* Because Central United had paid "benefits equal to what Mrs. Claybrook's chemotherapy providers accepted in full and final payment for their services to her as a Medicare patient," the district court concluded that there was no breach of contract. *Id.* at 1204-05.

In *Philadelphia American Life Insurance Co. v. Buckles*, 350 F. App'x 376 (11th Cir. 2009), the Eleventh Circuit reached a similar conclusion under Florida law. The *Buckles* court held that "actual charges incurred" as used in a supplemental cancer policy could only reasonably mean the "actual amount accepted by a health care provider as full satisfaction of the insured's obligations for treatment." *Buckles*, 350 F. App'x at 380; *id.* at 379 ("We conclude that the plain meaning of 'actual charges incurred' is the 'amount the provider accepts from an insurer as full satisfaction of the policyholder's liability.'") (citation omitted). *Buckles* is particularly instructive given that the Policy here insures for "loss incurred" and requires "proof

---

[23] The *Claybrook* court held that "in everyday and plain language, the term 'actual' means 'real,' 'existing,' not 'potential' or 'possible.'" *Id.* at 1204 (citing *The American Heritage Dictionary of the English Language*, Fourth Edition, 2000).

of loss" for each "incurred expense" in order to receive benefits.[24]  The *Buckles* court explained

that paying the list prices sought by the insured "would give him a benefit based on a fictional

amount and lead to an absurd result."  *Id.* at 380.  The Eleventh Circuit said:

> Construing the contract in the manner advanced by [the insured] would
> give him a benefit based on a fictional amount and lead to ***an absurd
> result*** ....  Neither [the insured] nor his primary insurer are liable for the
> amount above the $1,600,000 figure.  The language of the contract does
> not compel a reading which would require payment of the higher amount,
> and ***it is unreasonable to believe that the drafter of the insurance
> contract would have intended such a result***.

*Id.* at 380 (emphasis added).[25]

---

[24] The Eleventh Circuit cited several authorities holding that "incurred" equates with actual liability.  *See Buckles*, 350 F. App'x at 379 (citing *Reliance Mut. Life Ins. Co. of Ill. v. Booher,* 166 So. 2d 222, 224 (Fla. 2d DCA 1964) (where the district court, citing Webster's Dictionary, found "incurred" means that "the insured must have actually paid or must have become liable for"); *Ceballo v. Citizens Prop. Ins. Corp.,* 967 So. 2d 811, 815 (Fla. 2007) (finding that "to incur" an expense "means to become liable for the expense"); *Black's Law Dictionary* 782 (8th ed. 2004) (defining "incur" as "[t]o suffer or bring on oneself [a liability or expense]")); *see also Ark. Blue Cross & Blue Shield, Inc. v. Foerster*, 832 S.W.2d 280, 282 (Ark. Ct. App. 1992) ("[I]f a policy provides coverage for expenses or charges, it is the incurring of expenses which is considered the contingency that gives rise to the insurer's liability.").

[25] To the extent plaintiff relies on other cases which concluded generally that the words "actual charges" were ambiguous, none of those cases applied Alabama law, and none involved an evidentiary record like that presented here.  *Compare Guidry v. American Public Life Ins. Co.*, 512 F.3d 177 (5th Cir. 2007) (addressing different policy with no record evidence on "list prices" or provider testimony on what was actually being billed and concluding "actual charges" was ambiguous under Louisiana law); *Ward v. Dixie Nat'l Life Ins. Co.*, 2007 WL 4293319 (4th Cir. Nov. 29, 2007) (opining that "actual charges" was ambiguous under South Carolina law, prior to enactment of S.C. CODE ANN. ¶ 38-71-242(A)(1), which now defines "actual charges" as the amount the provider "agreed to accept or is obligated by operation of law to accept as payment in full"); *Lindley v. Life Investors Ins. Co. of Am.*, 2010 WL 723670 (N.D. Okla. Feb. 22, 2010) (finding "actual charges" ambiguous under Oklahoma law based on plaintiff's allegation that physician list prices were amounts "billed" for his treatment, but granting partial summary judgment to insurer based on Oklahoma's actual charges statue); *Gooch v. Life Investors Ins. Co. of Am.*, 264 F.R.D. 340, 358 (M.D. Tenn. 2009) (mistakenly finding that plaintiff was responsible for the balance of charges not paid by Blue Cross Blue Shield), *pet. for appeal granted, In re Life Investors Ins. Co. of Am.*, Case No. 10-501 (6th Cir. June 21, 2010).

Plaintiff's position in this case defies the plain and ordinary meaning of "actual charges" as used in the context of the Policy and instead urges the Court to adopt a strained definition that would achieve an "absurd result." *Buckles*, 350 F.App'x at 380. Because plaintiff's position is in direct conflict with well-established Alabama rules of contract interpretation, it should be rejected. *See, e.g., Celtic Life Ins. Co. v. McLendon*, 814 So. 2d 222, 225 (Ala. 2001) (rejecting insured's interpretation of policy because "it simply does not make sense"); *Preston*, 253 So. 2d at 6 (the Court is not "at liberty to make a new contract for the parties by a tortured construction").

B.      Under Alabama Law, The Policy Must Be Construed As a Whole And With The Fundamental Purpose Of The Policy To Insure Against "Loss" And To Measure Benefits By "Incurred Expenses"

Under Alabama law, "insurance contracts, like other contracts, are construed so as to give effect to the intention of the parties, and, to determine this intent, a court must examine *more than an isolated sentence or term;* it must read each phrase in the context of *all other provisions*." *Celtic Life Ins.*, 814 So. 2d at 224 (citation omitted; emphasis in original); *Turner v. U.S. Fid. & Guar. Co.,* 440 So. 2d 1026, 1028 (Ala. 1983) (the Court "cannot construe a sentence in the policy in isolation, but rather we construe it in connection with other provisions of the policy."); *Pritchett*, 834 So. 2d at 791 ("In determining whether a term or provision of an insurance policy is ambiguous, the court must construe the policy as a whole."). Here, plaintiff's Policy must be read in connection with the other provisions of the Policy, which expressly provide that the Policy insures for "loss incurred" and requires "proof of loss" for each "incurred expense."

The initial paragraph on the first page of plaintiff's Policy makes clear that the contract as a whole is an agreement to insure for "loss incurred" from cancer:

> We agree to insure you for *loss incurred*, while this policy is in force, from Cancer first Positively Diagnosed after the "waiting period", subject to the provisions on the following pages of this policy.

Policy at p. 1 (emphasis added). The "loss incurred" provision is an overarching provision that reflects the essence of the insuring agreement. In addition, Section C of the Policy, which addresses payment of benefits, states: "Benefit payments will be made . . . for *losses incurred* by any Covered Person under this policy. Proof of loss must be submitted to us for each *incurred expense*." Policy at p. 6 (emphasis added). The Policy requires plaintiff to submit a "proper written proof of loss." Policy, Section K, ¶ 9, at p. 15 ("Indemnities payable under this policy for any loss will be paid as soon as we receive proper written proof of loss.").

When construed as a whole, it is clear that plaintiff's Policy, which is described on the Application as a "Cancer Expense Policy," uses "actual charges" synonymously and consistent with an incurred expense. For example, the provision on "Bone Marrow Donor's Expenses" states that the Policy "will pay the following *expenses incurred* by your donor" and lists the "*actual charges*" for certain medical expenses as a type of "expense incurred" covered under this provision. *See* Policy, Section E, ¶ 17, at p. 8 (emphasis added). Similarly, the "Transportation" benefit provision lists the "*actual round trip charge* by Common Carrier" as one of the "*transportation expenses*" covered by the Policy. Policy, Section E, ¶ 18, at p. 9 (emphasis added). For all benefit payments, the Policy requires proof of loss to be submitted "for each incurred expense." Policy, Section C, at p. 6.

Under Alabama law, a medical provider's "list" prices, which no one is obligated to pay, cannot reasonably be construed as a "loss incurred" or an "incurred expense." In *Protective Industrial Insurance Co. of Alabama v. Gray*, 118 So. 2d 289 (Ala. Civ. App. 1960), the court rejected a similar contention that a hospital's unpaid list price or standard rate constituted an "actual hospital expense." In *Gray*, the State of Alabama arranged for and assumed financial

responsibility for an operation for the insured.  *Id.* at 290.  The plaintiff alleged that the amount of her hospital "bill" was $850.00 (*id.*), but the record evidence showed that the hospital had an arrangement to accept $414.50 from the State as payment in full for the operation, and the plaintiff "was not billed for any hospital expense, the hospital had never tried to collect from her, and she had never paid the hospital anything."  *Id.*  Under these facts, the appellate court held that, "where there exists no obligation on the part of the plaintiff below, express or implied, to pay anything, the plaintiff cannot be heard to assert a claim for 'items of actual hospital expense.'"  *Id.* at 291 (citing *U.S. v. St. Paul Mercury Indem. Co.*, 238 F.2d 594, 598 (8th Cir. 1956)).

In *St. Paul Mercury Indemnity Co.*, the insured, a World War II veteran, had a "poliomyelitis expense policy" under which the insurer agreed to pay him certain "expenses actually incurred" for medical treatment not to exceed $5,000.  238 F.2d at 595.  Upon hospitalization, the insured assigned his rights under the policy to the Veterans' Administration, which submitted "statements" to the insurer totaling $3,796.69.  *Id.*  "The insurer refused to recognize the purported charges as 'expenses actually incurred'" because the insured, as a veteran, was entitled to free care and the VA "was without authority under the statute to make any charge against him for the care and treatment furnished him."  *Id.*  The Government filed suit against the insurer to recover the price of the medical care as "expenses actually incurred by the Insured" under the policy.  *Id.*

The district court dismissed the Government's suit, observing that "[t]he claim of any debt" for the purported hospital expense was "a sham or pretense" that "lack[ed] that quality of 'actuality' which, the policy declares, must characterize the 'incurred expense.'"  *Id.* at 598.  The Eighth Circuit affirmed, holding that an amount for which plaintiff "was, under the statute, without any obligation to pay therefor" could *not* be construed as an "expense actually incurred."

*Id.* The Court noted that the word "[i]ncur emphasizes the idea of liability," and "it has been held that a thing for which there exists no obligation to pay, either express or implied, cannot in law be claimed to constitute an 'expense incurred.'" *Id.* (citations omitted).

Under Alabama law, the meaning of "incurred" is consistent with the analysis in *St. Paul Mercury* and establishes that the intent of the Policy is to insure for liability. *Arnett v. Arnett*, 812 So. 2d 1246, 1251 (Ala. Civ. App. 2001) ("The word 'incur' means 'to become liable or subject to.'") (citing *Miriam Webster's Collegiate Dictionary* 611 (10th ed. 1997)).  Other courts have similarly interpreted "incurred":

> the word 'incurred' emphasizes the idea of liability and the definition of 'incur' is:  'To have liabilities (or a liability) thrust upon one by act or operation of law'; a thing for which there exists no obligation to pay, either express or implied, cannot in law constitute an 'incurred expense'; a debt or expense has been incurred only when liability attaches.

*Irby v. Gov't Employees Ins. Co.*, 175 So. 2d 9, 10 (La. Ct. App. 1965) (citing *Drearr v. Conn. Gen. Life Ins. Co.*, 199 So. 2d 149 (La. Ct. App. 1960).  The Supreme Court of Virginia explained that the term "incurred" includes only amounts that the insured is legally obligated to pay:

> The evidence in the instant case was that Bowers would never be liable for any amount greater than that which the various health-care providers accepted as full payment for their services based on the Blue Cross fee schedule. Stated differently, the health-care providers' agreements with Blue Cross prevented them from collecting more than the scheduled fee and any required co-payment.  Therefore, ***we conclude that the medical expenses Bowers "incurred" were the amounts that the health-care providers accepted as full payment for their services rendered to him***. Bowers has not paid nor is he "legally obligated to pay" the amounts written off by the providers. To decide otherwise would be to grant Bowers a windfall because he would be receiving an amount greater than that which he would ever be legally obligated to pay.

*State Farm Mut. Auto. Ins. Co. v. Bowers*, 500 S.E.2d 212, 214 (Va. 1998) (internal citations omitted) (emphasis added).

In this case, the Policy insures for "loss incurred" and requires proof of loss "for each incurred expense" as a condition precedent to the receipt of benefits. "Loss" is a fundamental insurance concept that refers to "pecuniary injury" or "financial detriment."[26]   Under Alabama law, which requires contract terms to be construed in plain English and "in the context of all other provisions" of the Policy, *Celtic Life Ins.*, 814 So. 2d at 224, the Court should reject as a matter of law plaintiff's attempt to construe the inflated list price of $4,166.00 as the "actual charge" or "actual fee" for his Surgery Claim. The record is uncontroverted that this list price was not "incurred" by anyone; it does not represent a "loss incurred"; it is not a genuine "expense"; and it was not actually charged, billed, or paid by anyone.    Accordingly, Transamerica is entitled to summary judgment on plaintiff's claim for breach of contract.

IV.    TRANSAMERICA   IS   ENTITLED   TO   SUMMARY   JUDGMENT   ON
        PLAINTIFF'S BAD FAITH CLAIMS

The Court should also grant summary judgment in favor of Transamerica on plaintiff's "Breach of Implied Duty of Good Faith and Fair Dealing" claims (Count II) and "Bad Faith Denial of Full Benefits" claim (Count V) (collectively, the "bad faith claims").   Under Alabama law, it is fundamental that in order to state a cause of action for the bad faith failure to pay an insurance claim, the plaintiff must prove, *inter alia,* a breach of the insurance contract.   *Nat'l Sec. Fire & Cas. Co.  v. Bowen*, 417 So. 2d 179, 183 (Ala. 1982) (establishing elements of bad

---

[26] *Black's Law Dictionary* at 945 (6th ed. 1990) (defining "loss" as "pecuniary injury resulting from the occurrence of the contingency insured against"); *Black's Law Dictionary* at 956 (7th ed. 1999) (amount of financial detriment "for which the insurer becomes liable") Indeed, the fundamental purpose of insurance is to indemnify against actual "loss." *See Haynes v. United States*, 353 U.S. 81, 83 (1957) ("Broadly speaking, health insurance is an undertaking by one person for reasons satisfactory to him to indemnify another for losses caused by illness."); *see also Federal Ins. Co. v. Hartford Steam Boiler Inspection & Ins. Co.*, 415 F.3d 487, 495 (6th Cir. 2005) ("The purpose of insurance is to insure against a loss."); 10A *Couch on Insurance* § 144:1 (3d ed. updated 2007) ("medical insurance is an undertaking to indemnify another for losses occasioned by sickness and disease").

faith cause of action); *Hilley v. Allstate Ins. Co.*, 562 So. 2d 184, 190 (Ala. 1990) ("Having affirmed Allstate's summary judgment as to the Hilleys' breach of contract claim with regard to replacement cost, we must also affirm that summary judgment as to the Hilleys' bad faith claim with regard to replacement cost."); *Hillery v. Allstate Indem. Co.*, 705 F. Supp. 2d 1343, 1364 (S.D. Ala. 2010) ("Alabama law is clear that contractual liability is a prerequisite to recovery" on a bad faith claim). As discussed, plaintiff's breach of contract claim is unsupportable, and accordingly, plaintiff's bad faith claims fail as a matter of law.[27]

In addition, even if plaintiff could somehow create an issue of fact regarding his breach of contract claim (which he cannot), there is no question that Transamerica has a good faith arguable basis for its interpretation and payment of "actual charges" and "actual fee" in this case. Under Alabama law, a plaintiff bears a "heavy burden" in establishing a bad faith claim. *Nat'l Savings Life Ins. Co. v. Dutton*, 419 So. 2d 1357, 1362 (Ala. 1982). "Bad faith" is defined as "the intentional failure by an insurer to perform the duty of good faith and fair dealing implied by law." *Weaver v. Allstate Ins. Co.*, 574 So. 2d 771, 773 (Ala. 1990) (citation omitted). In order to establish a bad faith failure to pay claim, a plaintiff must prove (1) "the absence of any reasonably legitimate or arguable reason (the absence of a debatable reason)" to deny a claim *and* (2) that the insurer had "actual knowledge of the absence of any legitimate or arguable reason." *Dutton*, 419 So. 2d at 1361; *Peachtree Cas. Ins. Co. v. Sharpton*, 2001 WL 286919, at *4-5 (M.D. Ala. Mar. 20, 2001) (citing *Bowen*, 417 So. 2d at 183). A "plaintiff must go beyond

---

[27] To the extent that plaintiff's "Breach of Implied Duty of Good Faith and Fair Dealing" claim purports to assert a common law claim arising out of Transamerica's alleged "repudiation of the established contractual duties under the insurance contracts" (Complaint ¶ 54), plaintiff's claim is untenable. Under Alabama law, a plaintiff has no cause of action for breach of an implied duty of good faith and fair dealing sounding in contract. *See Lake Martin/Ala. Power Licensee Ass'n v. Ala. Power Co.*, 601 So. 2d 942, 945 (Ala. 1992) ("This Court has explicitly held that there is no good faith contractual cause of action.") (internal citations omitted).

a mere showing of nonpayment and prove a bad faith nonpayment, a nonpayment without any reasonable ground for dispute. Or, stated differently, the plaintiff must show that the insurance company had no legal or factual defense to the insurance claim." *Id.* at *5; *Pace v. Colonial Penn Ins. Co.*, 690 So. 2d 369, 371 (Ala. Civ. App. 1996) (citing *Bowen*, 417 So. 2d at 183). The Alabama Supreme Court has explained:

> In the normal case in order for a plaintiff to make out a prima facie case of bad faith refusal to pay an insurance claim, the proof offered must show that the plaintiff is entitled to a directed verdict on the contract claim, and, thus entitled to recover on the contract claim as a matter of law. Ordinarily, if the evidence produced by either side creates a fact issue with regard to the validity of the claim and, thus, the legitimacy of the denial thereof, the tort claim must fail and should not be submitted to the jury.

*Dutton*, 419 So. 2d at 1362; *State Farm Fire & Cas. Co. v. Billingsley*, 2010 WL 1511560, at *10 (S.D. Ala. Apr. 14, 2010). In addition, "the Alabama Supreme Court, 'has made it abundantly clear that an action for bad faith lies only where the insurer has acted with an intent to injure.'" *Peachtree Cas. Ins.*, 2001 WL 286919, at *5 (citing *Webb v. Int'l Indem. Co.*, 599 So. 2d 1144, 1146 (Ala. 1992)).

Transamerica's payment of benefits is consistent with the Policy language, directly supported by the Alabama district court's decision in *Claybrook* and the Eleventh Circuit's decision in *Buckles*, and is consistent with every state statute enacted on the subject. Thus, Transamerica indisputably had, at a minimum, an arguable and legitimate basis for its payment of benefits to plaintiff under the Policy. Plaintiff is therefore not entitled to a directed verdict on her contract claim, and summary judgment should be granted in favor of Transamerica on plaintiff's bad faith claim as a matter of law. *See, e.g.*, *Billingsley*, 2010 WL 1511560, at *11 (granting summary judgment on bad faith claim because "factual issues remain with regard to the validity of [the insured's] breach of contract counterclaim and thus, the legitimacy of the denial of her claim"); *Pace*, 690 So. 2d at 371 (affirming summary judgment on bad faith claim where

insurer had a "legal and factual defense" to the insured's claim); *see also Nat'l Sec. Fire*, 417 So. 2d at 185 ("If [plaintiff's] evidence fails to eliminate any arguable reason for denying payment, any fairly debatable reason on a matter of fact or a matter of law, he cannot recover under the tort of 'bad faith refusal.'").   Moreover, because Transamerica's payment of benefits under the Policy was consistent with *Claybrook*, the only Alabama authority addressing the meaning of "actual charges," plaintiff cannot possibly contend that Transamerica had "actual knowledge of the absence of any legitimate or arguable reason" for its payment of benefits or that it acted with the requisite "intent to injure" necessary for plaintiff to maintain a bad faith claim.  Transamerica is therefore entitled to summary judgment on plaintiff's bad faith claim.  *See, e.g.*, *Peachtree Cas. Ins.*, 2001 WL 286919, at *5 (granting summary judgment where insured could not contend that the insurer knew it lacked an arguable basis and where there was no evidence of "conscious intent to injure").

## V.   TRANSAMERICA IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S UNJUST ENRICHMENT CLAIM BECAUSE PLAINTIFF IS SUING ON A WRITTEN CONTRACT AND HAS AN ADEQUATE REMEDY AT LAW

The Court should grant summary judgment in favor of Transamerica on plaintiff's unjust enrichment claim because plaintiff has an adequate remedy at law.  "In Alabama, the doctrine of unjust enrichment is an equitable remedy which issues only where there is no adequate remedy at law."  *N. Assurance Co. of Am. v. Bayside Marine Constr., Inc.*, 2009 WL 151023, at *4 (S.D. Ala. Jan. 21, 2009).  "[A]n unjust enrichment claim sounds in the nature of quasi-contract" and "where a plaintiff has brought claims sounding in both express contract and quasi-contract as to the same subject matter, Alabama courts have deemed the quasi-contract claims not to be cognizable."  *White v. Microsoft Corp.*, 454 F. Supp. 2d 1118, 1132-33 (S.D. Ala. 2006).

In *Northern Assurance*, the insured asserted claims for breach of contract, bad faith, and unjust enrichment.  *N. Assurance*, 2009 WL 151023, at \*1.  The unjust enrichment claim was based on allegations that the insured had paid the premiums due under an insurance policy, that the insurer wrongfully denied its claims, and that the insurer had been "unjustly enriched by retaining the benefits of insurance premiums and denying coverage."  *N. Assurance*, 2009 WL 151023, at \*3.  The court dismissed the unjust enrichment claim, explaining that the insured had an adequate remedy at law because it would be compensated for any alleged loses if it prevailed on its breach of contract claim.  *Id.* at \*4.

Similarly, plaintiff here alleges both breach of contract and unjust enrichment claims in his Complaint.  Plaintiff's unjust enrichment claim alleges that Transamerica "collected or otherwise received insurance premiums . . . while denying full payments due" under the Policy and that "it would be inequitable" for Transamerica to retain the premiums.  Complaint ¶ 60.  Like the insured in *Northern Assurance*, plaintiff would be compensated for any alleged losses if he prevails on his contract claim, and he therefore has an adequate remedy at law.  Accordingly, plaintiff's unjust enrichment claim fails as a matter of law, and the Court should grant summary judgment in favor of Transamerica.

## VI.  TRANSAMERICA IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM FOR DECLARATORY AND INJUNCTIVE RELIEF

Transamerica is entitled to final summary judgment on Count IV of the plaintiff's Complaint seeking declaratory and injunctive relief because the plaintiff cancelled his insurance contract, and the Policy is no longer in force.  Byrne Decl. ¶ 18; Hall Dep. at 186.  Plaintiff has no need for a declaration or injunction and no standing to pursue this Count of his Complaint.  Moreover, the declaration plaintiff seeks in Count IV is circular and would be improper even if the plaintiff still owned a Transamerica Policy.

In Count IV of the Complaint, plaintiff seeks a two-part declaration: [1] "holding that the term 'actual charges' as used in Plaintiff Hall's [Policy] means the actual charges of health care providers for the services, treatments, and procedures performed [2] rather than the amounts the providers were paid by third-party payors." *See* Complaint ¶ 64.   Plaintiff also seeks an injunction requiring Transamerica to pay claims based on "this interpretation." *Id.*   Plaintiff cancelled his Policy, however, in October 2010 (Byrne Decl. ¶ 18), and he has no possibility of any future claims.   Moreover, even if plaintiff had maintained his insurance coverage, his proposed "interpretation" of the Policy's "actual charges" provisions is inherently defective.

It is well established that "a plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 185 (2000) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983)); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006); *Harmon v. City of Kansas City, Mo.*, 197 F.3d 321, 327 (8th Cir. 1999) ("Notwithstanding the fact that [plaintiffs] had standing to pursue a claim for damages, neither one now enjoys standing to seek injunctive relief.").   Standing for injunctive relief requires a plaintiff to make a "showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again – a 'likelihood of substantial and immediate irreparable injury.'" *Lyons*, 461 U.S. at 111 (citing *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974)).   "The fact of past damages, 'while presumably affording the plaintiff standing to claim damages does . . . nothing to establish a real, immediate threat that he would again' suffer similar injury in the future." *Harmon*, 197 F.3d at 327 (citing *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 210-11 (1995)); *Smook v. Minnehaha Cnty.*, 457 F.3d 806, 816 (8th Cir. 2005) ("It is well settled that 'past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects.'") (citing *O'Shea*, 414 U.S. at

495).  Similarly, to establish standing under the Declaratory Judgment Act, 28 U.S.C. § 2201,[28] a

plaintiff must show that "there is a substantial controversy, between parties having adverse legal

interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."

*Golden v. Zwickler*, 394 U.S. 103, 108 (1969); *Butler v. Dowd*, 979 F.2d 661, 673 (8th Cir.

1992).  "For a declaratory judgment to issue, there must be a dispute which 'calls, not for an

advisory opinion upon a hypothetical basis, but for an adjudication of present right upon

established facts.'"  *Ashcroft v. Mattis*, 431 U.S. 171, 172 (1977) (citation omitted).

Because the plaintiff cancelled his Policy effective October 17, 2010 (Byrne Decl. ¶ 18)

and has no pending claims for benefits under the Policy, and this action relates solely to the

payment of benefits for insurance claims plaintiff submitted in March 2007 (*id.* ¶ 9), plaintiff

lacks standing to pursue injunctive or declaratory relief.  The U.S. Supreme Court reached a

similar conclusion in *Lyons*, holding that, although the plaintiff had standing to pursue a claim

for past damages, "[a]bsent a sufficient likelihood that he will again be wronged in a similar

way," the plaintiff did not have standing to pursue injunctive relief.  *Lyons*, 461 U.S. at 111.

Here, because plaintiff's Policy is no longer in force, there is no "sufficient likelihood" that he

will be harmed in the future by any interpretation of the Policy.  Accordingly, plaintiff lacks

standing to pursue injunctive relief.  *See id.*; *Harmon*, 197 F.3d at 327 ("The mere fact that

injurious activity took place in the past does nothing to convey standing to seek injunctive relief

....").

---

[28] The Declaratory Judgment Act provides: "In the case of *actual controversy* within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, *may* declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201 (emphasis added).

In addition, because plaintiff's Policy is no longer in effect and he has no possibility of future claims, there is no actual controversy "of sufficient immediacy" to warrant declaratory relief.  *See, e.g.*, *Martin v. Sargent*, 780 F.2d 1334, 1337 (8th Cir. 1985) (plaintiff did "not have standing to seek declaratory relief" where he was no longer subject to conditions at issue); *Golden*, 394 U.S. at 109 (fact that it was "unlikely" that alleged dispute would occur "precluded a finding that there was 'sufficient immediacy and reality'" necessary for declaratory relief).  To the extent plaintiff seeks declaratory relief regarding *past* claims, the Court should exercise its discretion to dismiss the declaratory relief claim because it is duplicative of plaintiff's breach of contract claim and serves no useful purpose.  *Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995) ("If a district court, in the sound exercise of its judgment, determines after a complaint is filed that a declaratory judgment will serve no useful purpose, it cannot be incumbent upon that court to proceed to the merits before staying or dismissing the action.").[29]

Finally, plaintiff's proposed declaration is circular and inherently defective.  Plaintiff seeks a declaration "that the term 'actual charges' . . . means the actual charges . . . rather than the amounts the providers were paid by third-party payors."  *See* Complaint ¶ 64.  Even if the plaintiff had maintained his Policy and had some possibility of future claims, it would serve no useful purpose for the Court to make the circular declaration that "actual charges . . . means actual charges."  *Id.*

In addition, the second part of plaintiff's requested declaration (that actual charges means actual charges, *rather than amounts paid by "third-party payors"*) is also defective and would

---

[29] *See also Summit Props. Int'l, LLC v. LPGA*, 2010 WL 2382405, at *6 (S.D.N.Y June 14, 2010) (dismissing declaratory relief claim which served no useful purpose because "the declaratory judgment [wa]s duplicative of the breach of contract claim"); *see also* 26 C.J.S. *Declaratory Judgments* § 13 (Updated 2010) ("Discretion to deny [declaratory relief] is soundly exercised if ... other adequate remedies exist ....").

create confusion rather than help resolve future disputes.  Plaintiff's proposed declaration erroneously assumes that "actual charges" can never mean the amount paid by a third party. This is clearly wrong.  There is nothing in logic or law preventing a third party from paying the "actual charges," in whole or in part, for medical treatment or other services.  In fact, the record is now clear that the plaintiff's medical expenses for the surgery and anesthesia at issue were paid entirely by Medicare and United Healthcare.  Hall Dep. at 204-05.  Plaintiff paid none of the doctor's actual charges, and the checks he received from Transamerica were simply cashed and saved by the plaintiff.  Hall Dep. at 158, 167.  Under the terms of the Policy, the "actual charges" are the total charges actually owed as payment in full for the services rendered, regardless of who pays those actual charges.  *See Claybrook*, *supra*; *Buckles*, *supra*.  The Court should grant summary judgment and dismiss Count IV with prejudice.

<u>CONCLUSION</u>

For all of the reasons set forth above, Transamerica respectfully requests that the Court enter an order granting summary judgment to Transamerica and such further relief that the Court finds just and equitable.

Respectfully submitted,

*/s/ John K. Baker*

Markham R. Leventhal, Esq.              John K. Baker, Esq., Ark. Bar No. 97024
Farrokh Jhabvala, Esq.                  MITCHELL, WILLIAMS, SELIG,
Julianna Thomas McCabe, Esq.             GATES & WOODYARD, P.L.L.C.
JORDEN BURT LLP                         425 West Capitol Avenue, Suite 1800
777 Brickell Avenue, Suite 500          Little Rock, Arkansas  72201
Miami, Florida  33131                   Telephone:  (501) 688-8800
Telephone:  (305) 371-2600              Facsimile:  (501) 918-7850
Facsimile:  (305) 372-9928              jbaker@mwlaw.com
ml@jordenusa.com
fj@jordenusa.com                        *Attorneys for Defendants Transamerica Life*
jt@jordenusa.com                        *Insurance Company and AEGON USA, LLC*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 21, 2010, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to the following:

Gail O. Matthews, Esq.
Doralee I. Chandler, Esq.
MATTHEWS, SANDERS & SAYES
825 West Third Street
Little Rock, AR 72201

Frank H. Tomlinson, Esq.
Attorney at Law
15 North 21st Street, Suite 302
Birmingham, AL  35203

Paul S. Rothstein, Esq.
Attorney at Law
626 NE 1st Street
Gainesville, Florida 32601

*Attorneys for Plaintiff*

The undersigned hereby certifies that a true and correct copy of the foregoing was served by First-Class U.S. mail upon the following on this 21th day of December, 2010:

N. Albert Bacharach, Jr., Esq.
Attorney at Law
115 NE 5th Avenue
Gainesville, Florida 32601

_____*/s/ John K. Baker*_____

191390